UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **HERMAN ROBINSON, III**<br><br>Plaintiff,<br><br>vs.<br><br>**CITY OF INKSTER ET AL.,**<br><br>Defendants. | **2:22-CV-10059-TGB-KGA**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>**(ECF NO. 22)** |

On the evening of April 6, 2019, Officers Anastacia Arnica and Charles Cobble, both then working as police officers for the Inkster Police Department, were dispatched to a home in Inkster to perform a welfare check on a man named Ned Battle, Jr. A relative had called 911, expressing concerns that Mr. Battle, Jr. had sounded confused earlier that day when the caller spoke to him.

When police arrived at Battle's address, they found the house dark and abandoned. They also found Herman Robinson, III, the Plaintiff in this case, drinking and smoking marijuana with a friend in the garage. Though police did not know it at the time, the home belonged to Robinson's grandmother.

When officers asked about Ned Battle, Jr., Robinson said that Mr. Battle, Jr. was dead. Because the officers believed based on the call information that a witness had spoken to Mr. Battle, Jr. earlier that day,

1

the statement that he was dead prompted more questions. There is some dispute about what happened next. Officers Arnica and Cobble say Robinson became irate. They also say he refused to identify himself or explain his presence at the house, and denied having keys to the house. Robinson admits to making those statements, but says he was calm in his dealings with the police.

Ultimately, Robinson was handcuffed and, after a scuffle—the facts of which are also in dispute—ended up on the ground. Arnica and Cobble detained him for about 20 minutes until they believed they had identified him, then let him go.

Robinson now brings this lawsuit, alleging that he had been detained without probable cause or reasonable suspicion, subjected to excessive force, and that the officers had intentionally inflicted emotional distress upon him. Now before the Court is Defendants' Motion for Summary Judgment. For the reasons below, Defendants' Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

On April 6, 2019, a woman named Fiona[1] called the Inkster Police Department, concerned about a man named Ned Battle, Jr. ECF No. 23,

---

[1] Defendants state that Officer Cobble believed Fiona was Ned Battle, Jr.'s mother. ECF No. 28, PageID.576.

PageID.139. Fiona said that she was worried about Mr. Battle, Jr. because he sounded confused when he had called her. *Id.*

Two police officers, now Defendants Anastacia Arnica and Charles Cobble, were dispatched to the address Fiona had provided. When they arrived, they saw that the house had a lockbox on the door, "no furniture" was visible through the windows, and the house "appeared abandoned." ECF No. 23, PageID.165–66. The officers also noticed two men in the detached garage behind the house. *Id.* at PageID.166–67. Though the officers did not know it yet, these men were Plaintiff Herman Robinson, III and Christopher Allen.

Arnica and Cobble approached the detached garage to ask about Ned Battle, Jr. *Id.* The officers say that Robinson and Allen were listening to loud music, drinking alcohol, and smoking marijuana. *Id.* Cobble says that the music was so loud that the two men could not hear the officers and vice versa until it was turned off. *Id.* at PageID.168. It appears that Robinson left the garage and closed the door behind him, leaving Allen inside. ECF No. 23, PageID.348–50.

When the officers asked where Mr. Battle, Jr. could be found, Robinson responded that Ned Battle was dead. *Id.* at PageID.168–69. Robinson later explained that he was confused by the question and thought that the officers were looking for Robinson's grandfather, Ned Battle, Sr., who was indeed dead. ECF No. 23, PageID.262–63. But at the

3

time, Robinson did not explain his confusion to the officers nor explain that he was related to the Battle family.[2]

The officers then asked again, and Robinson responded that Ned Battle, Jr. did not live at the house. *Id.* at PageID.264. Cobble says that he asked Robinson if he had keys to the house or lived there. *Id.* at PageID.168–69. He says that Robinson refused to answer whether he lived there, but said "I don't have any fucking keys." *Id.* Robinson also declined to provide his name or his identification. *Id.* at PageID.265. Allen testified that he generally heard the officers' questions, but did not hear or could not recall what Robinson said in response. ECF No. 23, PageID.348–49.

Cobble says that all of this, but particularly Robinson's comment that Battle was dead, aroused his suspicions. It appears that the situation deteriorated fairly quickly. According to Cobble, Robinson was "flailing around," "throwing [his arms] up in the air," "screaming uncontrollably," and generally refusing to provide any information. *Id.* at PageID.171–72. Officer Arnica described Robinson as "angry" and "irate" throughout the entire encounter, and said that it was "impossible to converse with him." *Id.* at PageID.212. Cobble testified that Robinson never made any sort of threatening motion towards either of the officers. *Id.* at PageID.172–73.

---

[2] It appears that Ned Battle, Jr. is Robinson's uncle. *See* ECF No. 26-1, PageID.489.

At this point, Cobble and Arnica handcuffed Robinson. ECF No. 23, PageID.171–72. They patted him down and found no weapons. *Id.* at PageID.173. The officers then knocked on the garage door and asked Allen to come out, which he did. *Id.* at PageID.349. Allen said that he did not live at the house, did not know Robinson's name—he knew him only as "Buddy"—and did not know where Robinson lived. *Id.* at PageID.370.

Cobble says that the officers then began to walk Robinson—whose name they still did not know—towards their patrol car. *Id.* at PageID.175. But, Cobble says, Robinson began to scream and pull away from the officers. *Id.* at PageID.369. Cobble says in his report that he "placed [his] leg between [Robinson's] legs in an attempt to pull him towards the vehicle," but Robinson "then pulled away from [Cobble] and fell chest first to the ground in the driveway." *Id.* Cobble said that he "held part of [Robinson] up" as he fell, then "set him down gently with the assistance of Officer Arnica." *Id.* at PageID.156.

Robinson has a different account of the fall:

> [A]s I'm turning around the officer like put his leg in-between mine to trip me and push me on the ground and then he jumped on me with his knee on my back and doing all that aggressive police stuff that they be doing.

ECF No. 23, PageID.280. Robinson then asked Allen to start recording on his phone. *Id.* at PageID.369.

After the officers picked Robinson up and got him into the patrol car, Cobble checked his computer to see if there had been any previous encounters with anyone at that address. The records showed at least one prior encounter with someone named "Demetrius Robinson" who, in Cobble and/or Arnica's view, appeared to be the same person as Robinson. ECF No. 23, PageID.185. Though Cobble did not know it at the time, Demetrius is Plaintiff Herman Robinson's brother. *Id.* at PageID.286–87. Observing that this Demetrius "had 2 mental orders in the computer," and closely resembled the person he had just arrested, Cobble called his supervisor and asked what to do. *Id.* at PageID.369–70. Cobble's supervisor instructed Cobble and Arnica to release Robinson, which they did. *Id.* at PageID.186, 370. Cobble says that Robinson did not complain about being injured, and Cobble reported seeing no injuries on Robinson. *Id.* at PageID.190–91. Allen testified that Robinson complained that he was in pain right after the police left, but Allen did not see any visible injuries. *Id.* at PageID.354.

Robinson drove to the hospital later that night. *Id.* at PageID.289. He complained of pain in his back, neck, legs, knees, shoulders, chest, and chin. *Id.* at PageID.290. Doctors at the hospital noted mild abrasions to Robinson's knees, neck and back pain, and no acute findings in an X-ray exam. ECF No. 23, PageID.384. Robinson was prescribed "some medication," and his injuries healed. *Id.* at PageID.290–91. He also sought mental-health treatment.

6

From arrival to departure, the officers were at the house for just under half an hour. Officer Cobble's body-worn camera was not functional at any time. Cobble says that, before he came into work that day, his own usual body-worn camera had been broken. *Id.* at PageID.150–51. He grabbed a camera that was charging at the station, but the camera ran out of battery before Cobble and Arnica arrived at the house. *Id.*

Arnica's body-worn camera and patrol car dash camera captured some, but not all, of the encounter. Arnica testified that it was her practice to follow department protocol and turn on her body camera as soon as she arrived on a scene. ECF No. 23, PageID.204. But on this occasion, the camera did not record the entire interaction. ECF No. 23, PageID.213. Arnica says that the buttons the department used at that time were "very, very touchy, and any slight movement" could turn the camera on or off. *Id.* at 212. Thus, no police camera captured the moment Robinson fell to the ground, nor the officers' initial approach to the two men.

Robinson says that during the encounter, Officers Arnica and Cobble violated his constitutional rights under the Fourth and Fourteenth Amendments. He accuses the Defendants of conducting an unreasonable search and seizure, arresting him using excessive force, and intentionally inflicting emotional distress.

## II.   STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal quotations and citation omitted); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotations omitted, emphasis in original). The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80

8

(6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001) (internal quotations omitted). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52.

## III.   ANALYSIS

Plaintiff's complaint contains four causes of action. The first is a 42 U.S.C. § 1983 claim alleging that Arnica and Cobble searched and detained Robinson without reasonable suspicion. Plaintiff's second cause of action is that the Arnica and Cobble subjected him to excessive force. Robinson's third claim is a *Monell* claim against the City of Inkster, but he consents to dismissal of that claim in his Response to Plaintiffs' Motion for Summary Judgment. ECF No. 26. Finally, Robinson brings a cause of action for intentional infliction of emotional distress.

### A. § 1983 claims against Officers Arnica and Cobble

The doctrine of qualified immunity shields government officials from personal liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 181

9

(1982)). Qualified immunity balances two interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It applies whether the government official's error is a mistake of law, mistake of fact, or a combination of the two. *Id.*

At the summary judgment stage of a § 1983 action against a police officer, the plaintiff has the burden of demonstrating that the defendant is not entitled to qualified immunity because (1) the officer violated a constitutional right and (2) that right was clearly established. *Everson*, 556 F.3d at 494. That is, a plaintiff must both make out a prima facie case that a constitutional right has been violated *and* show that the law was so clear at the time of the incident that a reasonable officer in such a scenario would have known she was violating it. *Cain v. City of Detroit*, No. 12-15582, 2016 WL 6679831, at *2 (E.D. Mich. Nov. 14, 2016) (citing *Smith v. City of Wyoming*, 821 F.3d 697, 708–09 (6th Cir. 2016)). Though the plaintiff bears the burden of production on the qualified immunity issue, the court must still draw all reasonable inferences, in favor of the non-moving party. *Cain*, 2016 WL 6679831 at *3.

### 1.    Unreasonable search and seizure claim

The Fourth Amendment of the United States Constitution provides that the right of the people to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures, shall not be violated. U.S. Const. Amend. IV.

Where an officer possesses a reasonable and articulable suspicion that a person has been, is, or is about to be involved in criminal activity, he or she may conduct an investigative "*Terry*" stop and briefly detain that person to investigate the circumstances. *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994). During a *Terry* stop, an officer may request that a suspect identify him or herself, and the suspect does not have a Fourth Amendment right to refuse the request. *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 187–89 (2004). Additionally, a state may criminalize refusal to provide identification during a *Terry* stop. *Id.*

Police authority during a *Terry* stop is not unlimited. First, as discussed, there must be a proper basis for the stop—that is, the stop must be supported by reasonable suspicion. *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). Second, the degree of intrusion must be reasonably related to the scope of the situation at hand. *Id.* Among other things, the appropriate scope of a stop depends on the circumstances that originally justified it, its duration, whether the police used the least intrusive means reasonably available, and whether the police "diligently pursued a means of investigation … likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* (internal quotations omitted).

For Robinson to show a violation of his Fourth Amendment rights, he must show that Officers Cobble and Arnica lacked reasonable suspicion to conduct a *Terry* stop or that the degree of their intrusion exceeded what was reasonable under the circumstances. Robinson must also show that the Defendants are not entitled to qualified immunity. That is, if the Court agrees that Cobble and Arnica's stop exceeded the bounds of *Terry*, the Court must determine whether the right to be free from such a stop was "clearly established" at the time of the incident. While the right to be free from arrest without probable cause or a stop without reasonable suspicion is unquestionably "clearly established," the Supreme Court has cautioned against defining a right at a high level of generality. *See Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987). The ultimate question is whether a "reasonable police officer in the same circumstances and with the same knowledge … *could* have reasonably believed that probable cause existed in light of well-established law." *McLeod v. Bender*, No. 13-12878, 2015 WL 1470071, at *9 (E.D. Mich. Mar. 30, 2015) (Michelson, J.) (quoting *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 459 (7th Cir. 2010) (emphasis in original). This has been referred to as "arguable probable cause." *Id.* The same analysis applies to situations where officers are alleged to have conducted an investigative stop without reasonable suspicion. If officers had "arguable reasonable suspicion," they are entitled to qualified immunity. *See, e.g., Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019).

### a. Officers had reasonable suspicion to briefly detain Robinson to investigate a possible crime

Robinson's unreasonable search and seizure claim must fail. Even if Officers Arnica and Cobble lacked reasonable suspicion, a reasonable officer in their position could have believed it existed.

Arnica and Cobble were dispatched to an address to perform a welfare check on Ned Battle, Jr. When they arrived, the house appeared to be abandoned. They noticed two men in the garage. When they asked one of the men—Robinson—whether Mr. Battle, Jr. lived at the house, Robinson said that he was dead. While Robinson's confusion about which "Ned Battle" the officers were looking for is understandable in hindsight, Robinson did not express that confusion to the officers at the time. And reasonable sucpicion must be evaluated based on the information available to officers at the time, not in hindsight. *See United States v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008).

There is a dispute about Robinson's demeanor when police asked if either man lived in the house. Arnica and Cobble say that Robinson raised his voice and became irate, while Robinson says he remained calm throughout the encounter. But even viewing the evidence in the light most favorable to Robinson, as the Court must at this stage, it is undisputed that Robinson refused to say whether he lived in the house or to give his name, and it is undisputed that he told the officers he did not have keys.

So officers were faced with two men in the garage of a house that appeared abandoned but that was believed to be the home of Ned Battle, Jr., the subject of their attempted welfare check. And although police had been told earlier that day that a caller had spoken to Mr. Battle, Jr., and that the caller was concerned about Mr. Battle, Jr. because he seemed to be confused, now the officers were confronted with a situation where one of the men said that Mr. Battle was dead. Moreover, police could not determine whether the men lived in the house or had the owner's permission to be there; Robinson would not give his name or say that he lived there, and told the police he did not have keys.

Presented with these facts, officers Cobble and Arnica had reasonable suspicion to detain Robinson to further investigate their suspicions that he might be trespassing or otherwise involved in criminal activity.

### b. Whether the "degree of intrusion" was reasonable under the circumstances

Robinson's unreasonable search and seizure claim also fails under the second prong of evaluating an investigatory *Terry* stop. The "degree of intrusion" was reasonably related to the instant situation. Here, the temporary detention of Robinson lasted about 20 minutes, during which the officers questioned witness Allen, searched their database for information concerning prior contacts at the Inkster home address, called their shift supervisor for guidance, and immediately released him. ECF

No. 22, PageID.126. The Sixth Circuit has upheld longer *Terry* stops. *See, e.g. United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (50-minute detention upheld). The manner of the investigation was handcuffing Robinson and putting him inside the police car following what they believed was a misdemeanor committed in their presence.

Robinson contends that because the noise violation and possible trespassing were not called in by neighbors nor written down, that there is a genuine issue of material fact as to the reasonableness of the officers' actions. ECF No. 26, PageID.472–73; ECF No. 23, PageID.166–67. But as discussed above, there was reasonable suspicion of criminal activity that provided a proper basis for the stop in the first instance. The Court finds that under the circumstances, the officers acted reasonably in briefly detaining Robinson as they investigated his identity. Because the detainment was reasonable, it was also reasonable for the officers to restrain Robinson with handcuffs before moving him to the car.

### 2. Excessive force claim

The Fourth Amendment protects individuals from the use of excessive force by law enforcement officers. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Under *Graham*, all claims of excessive force by law enforcement officers, whether in the course of "an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* The inquiry is objective and considers "whether officers' actions are 'objectively

reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

As for qualified immunity, at the time of Robinson's arrest, it was clearly established that an individual has a constitutional right to be free from excessive force when they are not actively resisting police. *Moser v. Etowah Police Dep't.,* 27 F.4th 1148, 1153 (6th Cir. 2022). Actively resisting arrest includes "physically struggling with, threatening or disobeying officers" as well as "refusing to move your hands for police to handcuff you, at least if that inaction is coupled with other actions of defiance." *Rudlaff v. Gillispie,* 791 F.3d 638, 641 (6th Cir. 2015).

Robinson and the officers disagree about what happened as Robinson was being detained. Cobble testified that, as he was walking Robinson towards the car, Robinson pulled away from him. Cobble says that he put his leg between Robinson's leg to prevent him from pulling away further, and while he continued to pull away, Robinson fell to the ground. Robinson, for his part, says that Cobble tripped him intentionally and without provocation. He says that Cobble put his leg between Robinson's legs, pushed him to the ground, then put his knee on Robinson's back.

For purposes of this motion, the Court must view the evidence in the light most favorable to Robinson. Robinson testifies, essentially, that Cobble aggressively took him to the ground without provocation and without any "active" resistance on Robinson's part. If true, such an act

would violate a clearly established right. A police officer's administration of an "unprovoked body slam" violates the victim's clearly established constitutional rights. *Harris v. Langley*, 647 F. App'x 585, 590 (6th Cir. 2016).

Viewed in the light most favorable to the non-movant Plaintiff, Robinson was being detained on suspicion of a misdemeanor crime— either trespassing or playing music too loudly in violation of a local noise ordinance. As Cobble and Arnica both concede, Robinson never verbally threatened them or made any threatening gestures towards the officers. While he was handcuffed, Robinson says, Cobble violently took him to the ground. And photographs taken shortly after the encounter show that Robinson suffered minor injuries to his knees consistent with the treatment he describes.[3]

But, as the Supreme Court has observed: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 390 U.S. at 396 (internal quotations omitted). So the Court must review Cobble's use of force and

---

[3] That Robinson's medical records reflect only minor injuries undermines his claim that he was subjected to excessive force but does not doom it. An excessive force claim may still lie even when a plaintiff suffers only minor injuries. S*ee e.g., Wynn v. City of Pulaski, Tenn.*, No. 11-00025, 2013 WL 527154, at *9 (M.D. Tenn. Feb. 11, 2013) ("[W]hile [the Plaintiff] suffered relatively minor injuries during her arrest, there is a question of fact as to whether there was the need for the force applied."), *aff'd sub nom., Wynn v. Estes*, 543 F. App'x 535 (6th Cir. 2013).

determine whether it was objectively reasonable considering the totality of the circumstances. *See Harris*, 647 F. App'x at 589. In doing so, the Court must balance: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Applying this analysis to the case at hand, it is difficult to assess the relationship between the need for the use of force and the amount of force used because there are different versions of fact on each factor. Cobble says he put his leg between Robinson's leg to control him, he fell while trying to move away, and Cobble set him on the ground. Robinson says Cobble used his leg to violently force him to the ground for no apparent reason. This was while Robinson was handcuffed and unable to use his arms for balance or to catch himself when falling. As to the extent of injury, it is undisputed that his injuries were minor. Regarding whether the officer attempted to limit the amount of force, as stated, according to Cobble, he did just that, lowering Robinson to ground—while Robinson disputes this. The severity of the security problem at issue and the threat reasonably perceived by the officers was concededly not great: Robinson was not fighting or threatening the officers, and no weapons were involved. On the question of whether plaintiff was actively resisting,

18

Cobble says "[t]he issue was trying to not let him run away" and that Robinson was "trying to actively resist going into the vehicle." ECF No. 28-2, PageID.621. According to Robinson, he admits that he was "turning around" to look at the garage at the time he was taken down, but does not say he was trying to get away. ECF No. 26-1, PageID.497.

This is a close question. While a jury might ultimately believe officers Cobble and Arnica, if a jury accepted Robinson's version of the events: he was not resisting but was tripped then pushed to the ground with Cobble's knee in his back, the jury could conclude that such a degree of force was unreasonable under the circumstances. There is no video evidence of what happened, so Robinson's story is not so "blatantly contradicted by the record" that no reasonable juror could believe it. . *Scott v. Harris,* 550 U.S. 372, 380 (2007). Besides Cobble, Arnica, and Robinson, the only other person at the house—Christopher Allen— testified that he did not see what happened. The only available video, that taken by Mr. Allen, starts after the critical moment. Neither of the police officers' body-worn cameras were operational.

Because the Court must view the evidence in favor of the non-movant, Robinson's excessive force claim may proceed—at least against Officer Cobble. But the actions of each officer must be considered individually. *Cole v. City of Dearborn*, 448 F. App'x 571, 576 (6th Cir. 2011). And Officer Arnica is not liable merely because she was present

when an alleged constitutional violation occurred without some evidence of her direct participation. *Id.*

By Robinson's own admission, Arnica did not participate in the takedown directly. ECF No. 23, PageID.286. Robinson seeks to proceed on a theory that Arnica is still liable for failing to prevent the application of excessive force. Arnica could be liable if she "observed or had reason to know that excessive force would be or was being used" and "had both the opportunity and the means to prevent the harm from occurring," but still failed to act. *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006) (internal quotations omitted).

Robinson has not shown any of that. To be sure, Arnica was standing nearby when the takedown occurred. But there is no indication that she knew or had reason to know that a single, momentary violent act was about to erupt, or that she could have stopped it from happening. Therefore, Officer Arnica is entitled to summary judgment on Robinson's excessive force claim.

**B. State law claims against Officers Arnica and Cobble**

Robinson also brings a claim against both officers for intentional infliction of emotional distress ("IIED"). To make out such a claim, a plaintiff must show "extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985). "Extreme and outrageous" conduct is conduct "so outrageous in character, and so

20

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 908–09 (citing Restatement 2d Torts § 46). Put another way, it is conduct so extreme that "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 909.

Robinson says that Arnica's and Cobble's acts of turning off their body cameras was so exteme and outrageous that it satisfies the elements of an IIED claim. But putting aside the factual dispute about why the cameras were not on and even accepting, for the sake of argument, that turning the cameras off would have been extreme and outrageous, there is another problem.

Just as another judge of this Court observed when faced with a similar claim, Robinson does not point to anything that would suggest that either Arnica or Cobble intended to cause him emotional distress. *See Fleming v. Scruggs*, 465 F. Supp. 3d 720, 748 (E.D. Mich. 2020) (Leitman, J.). Even accepting that Cobble or Arnica intended to physically harm him, Robinson does not point to anything suggesting their intent to inflict an *emotional* injury. *Id.*, *see also Henderson v. Jackson*, No. 15-10807, 2016 WL 3125214, at *12 (E.D. Mich. June 3, 2016) (Lawson, J.) ("The plaintiff has presented ample evidence that [a defendant officer] intended to cause physical injury upon [the plaintiff], but there is no evidence that the defendant intended to inflict emotional

trauma … The plaintiff has not cited a single case in which a police officer's excessive force … has been found to support an IIED claim. In fact, Michigan law suggests the contrary."). Thus, Arnica and Cobble are entitled to summary judgment on Robinson's IIED claim.

## IV. CONCLUSION

For the reasons above, Defendants' Motion for Summary Judgment (ECF No. 22) is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** on the following claims of Plaintiff:

- Count I: Fourth Amendment unreasonable search and seizure claim against all Defendants;
- Count II: Fourth Amendment excessive force claim against Officer Arnica;
- Count III: *Monell* claim against the City of Inkster;
- Count IV: Intentional infliction of emotional distress claim against Officers.

Judgment in favor of Defendants is therefore be entered as to those claims. But summary judgment is **DENIED** as to Count II, Robinson's Fourth Amendment excessive force claim against Officer Cobble only.

**IT IS SO ORDERED**, this 30th day of September, 2023.

BY THE COURT:
s/Terrence G. Berg
TERRENCE G. BERG
United States District Court Judge